# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA

### *Alexandria Division*

**TONY DANE,**

     ***Petitioner,***

     **v.**                          **ACTION NO. 1:21-CV-854 (AJT/TCB)**

**HAROLD W. CLARKE,**
**DIRECTOR, VIRGINIA DEPARTMENT OF CORRECTIONS,**

     ***Respondent.***

## BRIEF IN SUPPORT OF MOTION TO DISMISS
## AND RULE 5 ANSWER

     The respondent, by counsel, submits the following brief in support of his Motion to Dismiss and Rule 5 Answer:

### Procedural History

     1.     Upon the petitioner's plea of not guilty, a jury trial was held in the Circuit Court for Loudoun County, Virginia, from March 19-23, 2018.  The jury convicted the petitioner of one felony count of involuntary manslaughter, in violation of Virginia Code § 18.2-36, and four misdemeanors including operating a vehicle without an operator's license – second or subsequent offense, in violation of Virginia Code § 46.2-300; operating an uninsured vehicle, in violation of Virginia Code § 46.2-707; reckless driving, in violation of Virginia Code § 46.2-852; and operating a vehicle after failing to submit it for inspection, in violation of Virginia Code §§ 46.2-1157 and 46.2-1171.  (Case Nos. CR31352-

00 through -04). (Respondent's Exhibit A, Conviction Order). At the sentencing hearing on July 12, 2018, the trial court sentenced petitioner in accordance with the jury's verdict to a total period of 10 years and 18 months in prison and fines totaling $3,500. (Respondent's Exhibit B, Sentencing Order).

2. The petitioner appealed to the Court of Appeals of Virginia. A panel of the Court of Appeals denied his petition in an opinion on May 22, 2019. (Record No. 1227-18-4) (Respondent's Exhibit C, Court of Appeals Denial Order). Petitioner appealed this decision to the Supreme Court of Virginia, who refused his appeal on February 21, 2020. (Record No. 191054) (Respondent's Exhibit D, Supreme Court of Virginia Refusal Order).

3. Petitioner filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on August 14, 2019. (Record No. 200794) (Respondent's Exhibit E, State Habeas Corpus Petition & Grant Order). He alleged multiple grounds on which he based his counsel's ineffectiveness. *Id.* at 3. First, petitioner claimed that his attorneys failed to consult with a pathologist or medical expert to determine the cause of death of the victim. *Id.* at 3, 23-24. Second, he claimed that his counsel were ineffective because they failed to consult an expert on the mechanics of his food truck, and that, had they done so, an expert would have explained (1) that the braking system was "two continuous systems" instead of one system and (2) that the brakes had been properly bled during its installation by a Colorado mechanic prior to petitioner's most recent repair. *Id.* at 3, 25-32. In his third and sixth claims, petitioner alleged that his counsel were ineffective because they failed to review the

evidence in his case with him and failed to properly investigate his case to prepare for trial. *Id.* at 32-34, 37-38. In his fourth claim, he alleged that his counsel failed to review and understand the prosecution's evidence. *Id.* at 3, 34-36. In his fifth claim, he alleged that his attorneys failed to challenge the elements of his charges. *Id.* at 3, 36-37. In his seventh claim, petitioner alleged that there were witnesses his trial counsel failed to interview and ultimately failed to call to testify. *Id.* at 3, 39-42. In his eighth claim, he alleged his counsel failed to move for the "recusal" of a particular juror because one of the prosecution's witnesses was her son's bus driver and because the juror "knew" the witness, she would have given more weight to the bus driver's testimony because of the "position of trust" the witness held as her son's bus driver. *Id.* at 3, 42-43. In his ninth and final claim, petitioner alleged that his counsel should have conducted a voir dire of Loudoun County Deputies Mike Petrakos and Brian Russell after the prosecution sought to have them qualified as experts, and that his attorneys' failure to do so constituted ineffective assistance because the witnesses were permitted to testify about subjects beyond the scope of their expertise. *Id.* at 91-92.

4.      The Supreme Court of Virginia on May 19, 2021, denied and dismissed the petition in a fourteen-page order. (Respondent's Exhibit F, *Tony Dane, No. 1930791 v. Harold W. Clarke, Director, Virginia Department of Corrections*, Supreme Court of Virginia, Record No. 200794, Order of May 19, 2021).

### *Facts*

5.     On Friday, September 8, 2017, at approximately 5:00 p.m., Erin Kaplan was driving in Loudoun County with her mother and three minor children as passengers. Her vehicle was struck by a "giant red bus" that had been converted into a food truck at the intersection of Watson and Evergreen Mills Roads. (Respondent's Exhibit G, Trial Transcript at 973, 975, 1026; hereinafter "Tr. at ___."). An eyewitness to the collision, Sarah DeWees, testified that she was behind Kaplan's car when she observed the collision and that "there was nothing [Kaplan] could have done" to avoid being hit by the food truck. (Tr. at 976). DeWees and Janet Bierly, another eyewitness, both testified that the food truck was traveling " so fast" before striking Kaplan's car. (Tr. at 975-76, 982). Charity Dokos, a Loudoun County Public Schools bus driver, testified that she first saw the food truck approximately 280 feet behind her bus. (Tr. at 996). The food truck passed her bus on its left side – into oncoming traffic – while she had her red lights and stop sign activated, only narrowly missing the schoolchildren exiting the bus at their stop. (Tr. at 993-94, 997, 1002).

6.     Patrick Beaver, who at the time of the crash was a detective with the Loudoun County Sheriff's Office, testified that while driving home the day of the crash, he became aware of the collision because an oncoming car flashed its lights at him and he heard a dispatch call on his police radio. (Tr. at 984-85). He activated his emergency lights and drove to the scene, where he saw "the bus was through [Kaplan's] vehicle" and heard "yelling and screaming coming from the car." (Tr. at 985-87). Detective Beaver saw Kaplan's mother in the front passenger seat

and a teenaged female in the seat behind Kaplan's mother. (Tr. at 988). He could hear at least one other voice screaming from inside the vehicle – what "sounded like a young child" – but he could not see any of the other occupants because the bus was on top of the car. *Id.* Detective Beaver knocked out the windows on the passenger's side of Kaplan's car and waited for fire and rescue to respond to the scene. (Tr. at 989-90).

7.    Dane spoke with Loudoun County Sheriff's Deputy Sean Allen at the scene; he spoke with Detective Michael Grimsley of the Loudoun County Sheriff's Office at the hospital, within an hour of the collision. (Tr. at 1018-19, 1026, 1052-53). Dane explained that he had been headed to Briar Woods High School to serve food at their football game. (Tr. at 1022, 1053). Dane said that he applied the brakes to try to stop for Dokos's stopped school bus ahead of him, but despite his pressing the brakes several times – depressing them to the floor – they did not work. He explained he then had to "take kind of emergency evasive action to go around the stopped school bus." (Tr. at 1022-23, 1053).

8.    Dane told Detective Grimsley that once he got to the intersection at Evergreen Mills Road, he struck Kaplan's vehicle because he was still unable to stop and could not "negotiate the turn." (Tr. at 1023, 1053). When asked by Deputy Allen if he tried any other measures to stop other than using his brakes, such as to run off the road, he answered that he "did not think it would be safe to do so because of the embankment that he had seen, as well as the two passengers in his vehicle sitting on barstools." (Tr. at 1053-54). During his investigation, Deputy Allen learned and testified that those barstools were not

equipped with seatbelts and that the only seat in the bus that had a seatbelt was the driver's seat.  (Tr. at 1054).

9.      Dane also told Detective Grimsley that prior to the collision, earlier in the day, the brakes felt "spongy" to him as if they were malfunctioning and not giving him the appropriate "stopping power."  (Tr. at 1023, 1028, 1030). Dane explained that he had installed a new rear brake line the Monday or Tuesday prior to the Friday night collision, after he noticed on the Saturday prior to the crash that the brake line was leaking "a little bit of brake fluid." *Id.*  Dane added brake fluid, although Detective Grimsley was uncertain whether Dane was claiming that he had added brake fluid prior to or after the repair.  (Tr. at 1029).

10.     Dane told Detective Grimsley that, at the time of the collision, his son had been holding Dane's cell phone and a GPS device and providing Dane with directions.  (Tr. at 1027).  Detective Grimsley testified that Dane told him he had not consumed any alcoholic beverages or used any drugs prior to the crash.  Detective Grimsley testified that based on his observations, it did not appear that Dane was under the influence.  (Tr. at 1027-28).

11.     When speaking with Detective Grimsley at the hospital, Dane said that he had a Colorado driver's license, although he had been living in Virginia for two years.  He was unable to produce a Colorado driver's license, claiming it was in his wallet which he had left behind in his food truck.  (Tr. at 1021-22). But when Deputy Allen searched the food truck on scene, prior to it being towed, he was unable to locate Dane's wallet or any driver's license.  (Tr. at 1054-55).

12.     Virginia Department of Motor Vehicles Special Agent John Hornberger testified that Dane was not licensed in Virginia and had been previously convicted in Virginia on January 27, 2014, for driving without a license. (Tr. at 1005-08). As a part of his investigation, Deputy Allen requested a certified transcript of Dane's driving record from Colorado's Division of Motor Vehicles. (Tr. at 1058). Per Deputy Allen, the transcript indicated that Dane was eligible to obtain a driver's license but was not in fact licensed on September 8, 2017. (Tr. at 1059). A copy of Dane's Nevada driving record transcript was also requested. (Tr. at 1060). Deputy Allen testified that Dane had been issued a Nevada driver's license on September 22, 2017, but that he did not have a valid Nevada license on the date of the crash. (Tr. at 1060-61).

13.     Special Agent Hornberger also testified that Dane submitted an application to the Virginia DMV on March 10, 2017 to register his food truck, certifying that it was insured. (Tr. at 1010-13). Dane told Detective Grimsley that he was insured through Progressive Insurance. (Tr. at 1022). However, a Progressive employee testified that neither any person named "Tony Steven Dane" with Dane's date of birth, nor any business trading as "Dane's Great American Hamburger," the name of Dane's food truck, had an insurance policy with their insurance agency on the date of the collision. Dane instead secured an insurance policy on September 28, 2017, three weeks after the crash, but covering only a van and sports car, not a school bus or a food truck. (Tr. at 1033-36). That policy expired on December 27, 2017. (Tr. at 1037). Deputy

Allen also researched whether Dane had any other active insurance policies for the food truck and testified that he could not find any. (Tr. at 1059-60).

14.     Deputy Allen, who was assigned to investigate the crash, testified that the weather on the day of the collision was clear, albeit "slightly cloudy," and that the road was dry. (Tr. at 1039, 1044). In describing the scene as depicted in prosecution's Exhibit 11, he explained that the black lines across the road were not skid marks, which would indicate that Dane applied his brakes and tried to stop, but rather were yaw marks, which indicated a drastic shift in the vehicle's weight causing the tires' rubber to rub off on the roadway. (Tr. at 1077-78, 1086-87). This portion of Deputy Allen's testimony was allowed without objection. *Id.* During Deputy Allen's inspection of the exterior of the food truck, he did not observe a Virginia inspection sticker, but he did see a 2011 Utah inspection sticker. (Tr. at 496, 1057).

15.     Master Trooper Norman Goins with the Virginia State Police searched the Motor Vehicle Inspection Program System and determined that Dane's food truck had not been inspected in Virginia, based on both the VIN and license plate numbers that he input into the system. (Tr. at 488-91).

16.     Deputy Allen also testified that on September 15, he drove the route Dane took on September 8, at approximately the same time of day Dane travelled it. He began in Middleburg, where Dane told Detective Grimsley he first experienced braking issues, and ended at the intersection of Watson and Evergreen Mills Roads. (Tr. at 1061, 1065). He recorded his travel of that route using his police vehicle's camera, and the recording was shown to the jury as

prosecution's Exhibit 15.  Deputy Allen narrated the video and testified about the gas stations, parking lots and other stopping places he observed along the route, and he also recounted that he used his brakes several times throughout his trip.  He testified that there were roundabouts and at least one stoplight for which brakes would have been necessary during the trip.  (Tr. at 1064-69, 1080-82).  During cross-examination, he conceded that there were no stop lights or stop signs along the route that would have required Dane to use his brakes.  (Tr. at 1083).

17.    Loudoun County Sheriff's Deputies Mike Petrakos and Brian Russell both inspected the food truck – initially at the scene and then more thoroughly once the food truck was towed back to the sheriff's office.  (Tr. at 380, 385-86, 445, 448).  Deputy Petrakos testified that the food truck appeared to have been in "some type of salty environment" because of the extensive rust and rust scaling on the underside of the food truck.  (Tr. at 386).  Deputy Allen requested that one of the brake calipers and a portion of the brake line be removed from the food truck for a detailed inspection.  (Tr. at 1070-71, 1073).  Deputy Petrakos removed those parts and conducted the inspection.  (Tr. at 388).

18.    Deputy Petrakos explained that he had trouble removing the tires to gain access to the calipers because of "a lot of rust particles . . . coming off the [lug nuts]."  (Tr. at 389-90).  He also had to "use a sledgehammer to get the rim and tire off the bus," which indicated to him that the "tires hadn't been off in a while."  (Tr. at 390).  One of the driver's side tires had a three-and-a-half-inch split in its sidewall, exposing the metal mesh material beneath the rubber.  (Tr.

at 400, 419).  He said that gash was "relatively new" because the metal mesh material had not rusted.  (Tr. at 420).  An 11-inch split in the sidewall on the right side tire was older because the exposed mesh material there was rusted and there was "debris inside that split."  (Tr. at 401, 421).

19.    Deputy Petrakos explained that Dane's food truck should not have been on the road due to the splits alone in the tires, according to the standards of the Commercial Vehicle Safety Alliance, because those defects were ripe to cause "a catastrophic tire failure," otherwise known as a "blowout."  (Tr. at 401, 422).  The other two tires had been recently replaced.  (Tr. at 423).

20.    Deputy Petrakos described that one of the caliper hoses looked "twisted" and "maybe compressed" and was "restricted," which "was out of the ordinary."  (Tr. at 393-94).  He explained that one of the calipers was not connected to the brake booster, which supplies "more energy," making braking easier.  (Tr. at 394-95).  He testified it was also "odd" that the bleeder valves, which "let [unwanted] air out of the [brake] system," did not have any "tool marks" on them, given Dane's assertion that he had recently completed a brake line replacement.  (Tr. at 394, 396, 398-99).  The bleeder valves themselves were also rusted.  (Tr. at 397-98).  Deputy Petrakos testified that one of the brake lines had an "obstruction[,] . . . which would restrict the flow of the hydraulic fluid through the brake line" and therefore inhibit the calipers from signaling to the brake pads that they needed to close to cause the food truck to stop.  (Tr. at 391-93).

21.    Additionally, Deputy Petrakos said that Dane's food truck's brake lights were not functioning prior to the crash because the connector was rusted and so not connected.  (Tr. at 402-03).  Dane's power steering fluid was not measurable on the dipstick.  (Tr. at 404, 478-79).

22.    Deputy Russell opined that Dane's brake malfunction was the result of brake failure.  (Tr. at 465).  He said that when Dane replaced the brake line air remained in the system "that was not bled out." *Id.*  He explained that during Dane's travel, "the air essentially circulated the system and reduced, and reduced, and reduced the actual braking force until there was none." *Id.*

23.    Deputy Petrakos told the jurors about the alternative braking options Dane could have used other than his pedal braking system.  Those options included "engine braking," which requires downshifting gears to manually reduce the transmission speed and consequently reduce the food truck's speed, or engaging the parking brake.  (Tr. at 405-08, 440-41).  He agreed that engaging the parking brake would be a less effective way to stop the vehicle, particularly because the food truck was travelling downhill just before impact.  (Tr. at 408, 427, 441-42).

## **Present Petition**

24.    On or about July 22, 2021, petitioner filed his current timely federal petition for a writ of habeas corpus, alleging that his rights guaranteed under the Sixth, Eighth and Fourteenth Amendments were violated because of his ineffective assistance of counsel.  (Pet. at 4).  Specifically, petitioner re-alleges

each of the nine claims of ineffective assistance that he raised in his state habeas petition in the Supreme Court of Virginia:

> Ground 1 – Failure of counsel to consult with a pathologist or medical expert to determine the victim's cause of death

> Ground 2 – Failure of counsel to provide "adversarial testing" by not consulting an expert on the mechanics of the food truck

> Ground 3 – Failure of counsel to review the evidence with petitioner

> Ground 4 – Failure of counsel to review and understand the evidence presented by the prosecutor

> Ground 5 – Failure of counsel to challenge the elements of the charges brought against him

> Ground 6 – Failure of counsel to investigate his case

> Ground 7 – Failure of counsel to call or interview certain witnesses

> Ground 8 – Failure of counsel to recuse a juror

> Ground 9 – Failure of counsel to voir dire expert witnesses.

(Pet. at 10-26).

## **Exhaustion and Procedural Default**

25.    Absent a valid excuse, a state prisoner must exhaust his remedies in state court before seeking habeas corpus relief in federal court.  28 U.S.C. § 2254(b).  The petitioner bears the burden of proving exhaustion.  *See Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).  State prisoners must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 846 (1999).  The exhaustion requirement is satisfied by a finding that the "essential legal theories and factual allegations advanced in

federal court . . . [are] the same as those advanced at least once to the highest state court." *Pruett v. Thompson*, 771 F. Supp. 1428, 1436 (E.D. Va. 1991), aff'd, 996 F.2d 1560 (4th Cir. 1993) (citing *Picard v. Connor*, 404 U. S. 270, 275-76 (1971)).

26.    A separate but analytically related bar to federal habeas review is the doctrine of procedural default.  "If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Breard*, 134 F.3d at 619.

27.    The claims in the current habeas petition are exhausted for purposes of federal habeas corpus review.  *See Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997).

## Merits Standard of Review

28.    Review by this Court of the merits of the claims petitioner raised in state court is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA).  *See* 28 U.S.C. § 2254(d).  Under AEDPA, "a federal court may not grant a state prisoner's habeas application unless the relevant state-court decision either 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,'" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009); *see Muhammad v. Kelly*, 575 F.3d 359,

367 (4th Cir. 2009); *see also* 28 U.S.C. § 2254(d). "The required deference encompasses both the state court's legal conclusions and its factual findings." *Lenz v. Washington*, 444 F.3d 295, 299 (4th Cir. 2006).

29.     The AEDPA standard:

> is a difficult to meet," and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."

*Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citations and quotations omitted).

30.     "Under § 2254(d)'s 'unreasonable application' clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). A state court decision is unreasonable "only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e] [Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508-09 (2013) (per curiam) (quoting *Harrington*, 562 U.S. at 102).

31.     The federal court reviews the "ultimate decision of the state court, and not the specific contents of its reasoning or opinion." *Blanton v. Quarterman*, 543 F.3d 230, 236 (5th Cir. 2008). The state court need not articulate, or even know, the clearly established Supreme Court law, so long as its reasoning and decision do not contradict such law. *See Lenz*, 444 F.3d at 307. Furthermore, "a determination on a factual issue made by a State court shall be presumed correct." *Tucker v. Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C.

§ 2254(e)(1). And a petitioner seeking habeas relief must present 'clear and convincing evidence' to rebut the presumption of correctness that the state court's determination enjoys. *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) (quoting § 2254(e)(1)).

### Ineffective Assistance of Counsel Standard

32.   Petitioner has alleged nine grounds to demonstrate ineffective assistance of counsel. The Supreme Court of Virginia's decision on these claims were not contrary to, or an unreasonable application of a United States Supreme Court decision, nor were those decisions based on an unreasonable determination of facts. Therefore, this Court should defer to the state habeas decision of the Supreme Court of Virginia.

33.   The petitioner cannot meet the highly demanding standard set forth for such claims in *Strickland v. Washington*, 466 U.S. 668 (1984). Under Strickland, he has the burden to show that his attorney's performance was deficient and that he was prejudiced as a result. *See Strickland*, 466 U.S. at 687.

34.   In determining whether counsel's performance was deficient "judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 266 U.S. at 688. Accordingly, "a (habeas) court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

35.   "The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict suspect."

*Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000) (reviewing court "must be highly deferential in scrutinizing [counsel's] performance and must filter the distorting effects of hindsight from [its] analysis").

36. The first prong of the *Strickland* test, the "performance" inquiry, "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

37. The second prong of the *Strickland* test, the "prejudice" inquiry, requires showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.*

38. An ineffective counsel claim may be disposed of on either prong because deficient performance and prejudice are "separate and distinct elements." *Spencer v. Murray*, 18 F.3d 229, 232-33 (4th Cir. 1994); *Strickland*, 466 U.S. at 697.

39. Finally, when evaluating claims of ineffective assistance of counsel, federal habeas relief

may be granted only if the state-court decision unreasonably applied the more general standard for ineffective-assistance-of-counsel claims established by *Strickland*, in which this Court held that a defendant must show both deficient performance and prejudice in order to prove that he has received ineffective assistance of counsel.

*Mirzayance*, 556 U.S. at 122. "Under the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard," "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable -- a substantially higher threshold.'" *Id.* at 1420 (quoting *Landrigan*, 550 U.S. at 473). "And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.*

### Discussion of Claims

40.    In addressing this same Ground 1 as Dane asserts in his federal petition, that counsel was ineffective for failing to consult with a pathologist or medical expert to determine the victim's cause of death, the Supreme Court of Virginia held as follows:

> The record, including the trial transcript, the stipulation of facts, exhibits from trial, and the affidavits of both of petitioner's counsel, demonstrates that petitioner owned a food truck, a modified 40-foot bus that weighed over 22,000-pounds, and that petitioner drove the bus from Front Royal through Middleburg, en route to Ashburn to sell food at a high school football game. Petitioner told Detective Michael Grimsley that in Middleburg he noticed his brakes started to feel 'spongy,' meaning they 'weren't giving him the stopping power he needed,' and he was 'not able to slow down at [his] normal rate.' Despite passing several gas stations and other locations where he could have pulled over, petitioner chose to continue driving his 22,000-pound bus even though his brakes were not working properly. As he neared the intersection of Watson Road and Evergreen Mills Road, petitioner approached a stopped school bus.

17

> He pressed his brakes several times, but they failed completely, and he was unable to stop the bus. He swerved around the school bus, narrowly missing a child crossing the street, attempted but failed to make right-hand turn from Watson Road onto Evergreen Mills Road, and then ran a stop sign at the intersection, crashing into a car driven by Erin Kaplan. Kaplan's mother and three children were also in the car. Emergency responders arrived at the scene shortly after the crash but were unable to reach Kaplan to assess or treat her because she was trapped in her vehicle, which was under petitioner's bus. When they finally were able to reach Kaplan approximately three hours after the crash, she was pronounced dead at the scene. The record does not support petitioner's assertion that Kaplan survived the impact.

(Resp. Exh. F at 2). The Supreme Court of Virginia recounted petitioner's statements to law enforcement that he had personally replaced the rear brake line on his bus four or five days prior to the crash and had not driven it post-repair to ensure the brakes were working properly, and the evidence that petitioner failed to "bleed" the brake line after completing his repair. *Id.* Additionally, the Supreme Court of Virginia referenced the prosecution's evidence that petitioner did not have a driver's license, did not have his bus insured, and that the bus "should not have been on the road." *Id.* Finally, the court referenced the medical examiner's determination that Kaplan's cause of death was blunt force head and lower extremity trauma as a result of the crash. (*Id.* at 3).

41. The Supreme Court of Virginia determined that petitioner failed to demonstrate his counsel's deficient performance or prejudice because petitioner's striking Kaplan's vehicle with his bus was the cause of her death. *Id.* The court further explained that, despite emergency personnel being delayed in being able to access Kaplan because she was trapped in her vehicle beneath

petitioner's bus, it was still petitioner's causing the crash that resulted in Kaplan's inaccessibility and the ultimate delay of any treatment that may have been able to be rendered had she been able to be reached sooner. *Id.* Finally, the court concluded "Counsel made a tactical decision to focus their defense on challenging the Commonwealth's evidence of criminal negligence, as opposed to focusing the jury's attention on Kaplan's injuries and death. Counsel was not unreasonable for concluding a medical expert would not benefit the defense in this case, and for choosing to stipulate to the medical examiner's report and attempting to minimize the amount of live testimony regarding Kaplan's injuries and suffering." *Id.*

42. Against this backdrop of evidence, the state habeas court's conclusions were not contrary to clearly established federal law or based on an unreasonable determination of the facts based on the evidence, as determined. The crash occurred at approximately 5:00 p.m. (Resp. Exh. G at 1026). Dr. John Morgan, an eyewitness who "briefly assessed" the passengers of Kaplan's vehicle, could not initially access Kaplan, but once she was extracted, he pronounced Kaplan dead at 8:30 p.m. (Respondent's Exhibit H, Stipulations of Fact at ¶ 1). Because Kaplan was inaccessible prior to being extracted, her condition was unknown prior to Dr. Morgan's assessment of her, and consequently, how long she lived post-collision is unknown as well. Petitioner's contentions regarding the emergency services log being "off by 12 minutes" and the arrival times of medical personnel on scene do not negate the findings of the medical examiner that Kaplan's death was caused by the blunt force head and

lower extremity trauma she sustained as a result of the crash petitioner caused by operating an ill-maintained food truck. This Court, therefore, should defer to the ruling of the state court as it relates to petitioner's Ground One, and this claim should be dismissed.

43.     In his Grounds 2 and 7, petitioner alleges his counsel failed by not consulting an expert on the mechanics of food trucks, by not offering evidence from such an expert at trial on the matter, and generally, that his counsel failed to interview and call certain witnesses. (Pet. at 12-14, 20-21). The Supreme Court of Virginia determined that, contrary to petitioner's assertion that his bus's brake system was "two continuous systems," the prosecution's evidence proved it was a single continuous system, and also proved that petitioner's failure to bleed the brakes introduced air into the brake line, causing their ultimate failure. The court also found that petitioner "failed to proffer the name of any expert who would have testified in support of [his] theory that the brake failure was caused by something other than [his] failure to bleed the brake line." (Resp. Exh. F at 3-4). For these reasons, the court dismissed this claim, holding that petitioner failed to demonstrate his counsel's performance was deficient, or that there was a reasonable probability that, but for counsel's alleged error, the result of the proceedings would have been different. *Id.* at 4.

44.     The state court's conclusions were not contrary to clearly established federal law or based on an unreasonable determination of the facts based on the evidence submitted. Petitioner's attorney Adam Pouilliard averred in his affidavit that he "did not believe that an expert on the mechanics of the

food truck would [have] aid[ed him] in representing Mr. Dane." (Respondent's Exhibit I, Pouilliard Aff. at 3, ¶ 15). Petitioner's other counsel Shayan Noor, also swore in his affidavit that he had a great deal of knowledge about brake repair based upon his personal experience in completing such repairs. (Respondent's Exhibit J, Noor Aff. at 2). Dane's attorneys' affidavits demonstrate the reasonableness of their decision not to offer an expert of the mechanics of food trucks. Furthermore, the cumulative weight of the prosecution's evidence was significant: the food truck's brakes' disrepair; petitioner's lack of either a standard or a commercial driver's license; the food truck's lack of any Virginia safety inspection; lack of vehicle insurance; and the overall poor condition of the food truck. The evidence showed that the truck, suffered from "unbalanced weight distribution, kinked brake line, poor tire condition, inoperable brake lights, minimal power steering fluid, significant rust and scaling on the underside of the bus and rusted wheels." Taken together, the evidence proved Dane's reckless disregard of human life by continuing to operate the vehicle in such disrepair. (Resp. Exh. C at 6-7). It seems improbable that the weight of this combined evidence would have been overcome had a food truck mechanics expert been called. Where a different outcome is not likely, Dane does not demonstrate prejudice. As a result, this Court should defer to the ruling of the state court as it relates to petitioner's Grounds 2 and 7, and these claims should be dismissed.

45.     In his Grounds 3, 4, and 6, petitioner claims his counsel failed to review the evidence in the case with him, to review and understand the evidence

presented by the prosecutor, and to investigate his case. (Pet. at 14-16, 19-21).

Petitioner specifically asserts that his counsel "promised on several occasions he would review all the evidence with [him, but t]his never happened." (Pet. at 15). He claims that his attorneys failed to contest that his food truck was overweight, alleging that it was in fact underweight and that food trucks are typically heavier on their left side. *Id.* Petitioner contested his attorneys' understanding and trial strategy in addressing several pieces of evidence, including, but not limited to, the effect of power steering in the crash, the difference between yaw marks and skid marks, Deputy Petrakos's testimony, and the condition of his brake lights. (Pet. at 16, 19).

46. In denying these same claims, the Supreme Court of Virginia opined, "Whether most food trucks have uneven weight distribution is not relevant to whether petitioner's bus was safe to be on the road in the condition it was in and counsel could reasonably have determined expert testimony regarding the general weight distribution of food trucks would not have been helpful to petitioner." (Resp. Exh. F at 6). The court also found that "[c]ontrary to petitioner's assertion, the deputies' testimony was consistent that the power steering level was below the amount required for power steering to function properly and there was no evidence that it was leaking." *Id.* at 6-7. The court also determined that it was reasonable for petitioner's counsel to choose not to offer evidence that petitioner had installed a trailer hitch package on his food truck at some point to explain why the brake light connector was detached because, regardless of the cause, at the time of the crash, petitioner's brake

lights were in fact not functioning. *Id.* at 7. There was even evidence offered by the prosecution that the connector was rusted where the brake lights would have been plugged into the brake booster. *Id.* This would indicate the brake lights had been disconnected for some period of time to permit the rust. (Resp. Exh. G at 403). For these reasons, the court dismissed these claims, holding that petitioner failed to demonstrate his counsel's performance was deficient, and also failed to show that there was a reasonable probability that, but for counsel's alleged error, the result of the proceedings would have been different.

47. The state court's conclusions with respect to Grounds 3, 4, and 6 were not contrary to clearly established federal law or based on an unreasonable determination of the facts based on the evidence. The choice of trial tactics generally is left to the judgment of counsel, not the defendant, and in habeas corpus review, those choices will seldom be overridden. *See e.g.*, *Goodson v. United States*, 564 F.2d 1071 (4th Cir. 1977); *Jones v. North Carolina*, 547 F.2d 808 (4th Cir. 1977); *Johnson v. Riddle*, 222 Va. 428, 433, 281 S.E.2d 843 (1981); *Abbott v. Peyton*, 211 Va. 484, 178 S.E.2d 521 (1971). Petitioner's attorneys both swore in their affidavits that they reviewed the evidence of his case with him. (Resp. Exh. I at 3; Resp. Exh. J at 2).

48. Counsel is required to communicate with and receive consent from his client regarding only certain "fundamental issues that must be personally decided by the client," such as entering a plea, waiving a jury, testifying and appealing a conviction or sentence. *United States v. Chapman*, 593 F.3d 365, 369 (4th Cir. 2010). And "an attorney undoubtedly has a duty to consult with

the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004), quoting Strickland, 466 U.S. at 688.  But tactical decisions are left to the sound judgment of counsel. *Strickland*, 466 U.S. at 689.

49.     Petitioner's counsel concluded that the best approach was to argue that "Dane's brake system had failed in a manner which would have resulted in 'spongy' but functional brakes that worsened over time, but in a manner that was imperceptible to the vehicle's operator." (Resp. Exh. J at 2).  The jury's rejecting petitioner's theory of the case does not mean his attorneys were ill-prepared or that their "representation fell below an objective standard of reasonableness" under *Strickland*'s first prong.  It only means that the jury did not find the reasonable doubt for which petitioner's counsel argued. Furthermore, petitioner has failed to articulate how a further review of the evidence with him would have resulted in disproving the facts he alleges were false.  In many instances, the only contrary proof would have had to come from petitioner testifying to his own version of the events, but he chose not to after being counseled by his attorneys.  (Resp. Exh. G at 512-514, 553; Resp. Exh. I at 3).  For these reasons, this Court should defer to the ruling of the state court as it relates to petitioner's Grounds 3, 4 and 6, and those claims should be dismissed.

50.     In his Ground 5, petitioner claims that his counsel failed to challenge the elements of the charges brought against him.  He asserts that his attorneys "accepted" the prosecution's evidence and theories and failed to

contest them. (Pet. at 17-18, 28-32). But Attorneys Noor and Pouilliard explained that they reviewed the prosecution's mechanical experts' reports, met with those experts, conducted their own research, and physically reviewed the evidence, using Attorney's Noor's knowledge about vehicle mechanics. (Resp. Exh. I at 2-3; Resp. Exh. J at 2).

51. These efforts demonstrate that his attorneys were diligent in gaining an understanding of the evidence, investigating petitioner's case, and preparing to represent him at trial. And petitioner had the benefit of being represented by two attorneys, which has been held to "seriously undermine [an] appellant's claim of ineffective assistance of counsel." *Frye v. Lee*, 235 F.3d 897, 907 (4th Cir. 2000) (citing *Lopez-Nieves v. United States*, 917 F.2d 645, 647 (1st Cir. 1990)).

52. In its ruling dismissing this same claim, the Supreme Court of Virginia wrote

> The record, including the trial transcript and the affidavits of counsel, demonstrates that, contrary to petitioner's assertions, counsel did in fact challenge the Commonwealth's evidence of criminal negligence in two motions to strike and argued that petitioner's actions did not rise to the level of criminal negligence. Counsel argued that the various maintenance problems the Commonwealth proved, such as the brake lights being out, the low power steering fluid, and the gash in the tires, did not contribute to the crash. Counsel was successful in getting one of the Commonwealth's experts to admit that the brake failure happened gradually as the air bubbles built up throughout the drive, and counsel argued that petitioner had no way of knowing that . . . just because the brakes felt 'spongy' in Middleburg, they would fail completely before he arrived in Ashburn. Petitioner has failed to articulate how else counsel could have successfully challenged the evidence of criminal negligence. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there

is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

(Resp. Exh. F at 11).

53.    Those conclusion are neither an unreasonable application of a United States Supreme Court decision nor based on an unreasonable determination of facts.  This Court should defer to the ruling of the state court as it relates to petitioner's Ground 5, and this claim should be dismissed.

54.    Petitioner alleges in his Ground 8 that there was a sufficient basis for Juror Emily Belcher to be removed from the jury panel simply because she was aware that one of the prosecution's witnesses was her son's bus driver, arguing that because that witness held a position of trust as Belcher's son's bus driver, Belcher would find her testimony inherently credible.   (Pet. at 22-23). Petitioner argues that his attorneys should have determined these facts alone to be a sufficient basis for them to move the trial court for her disqualification, and that they were ineffective for failing to do so.  (Pet. at 32-33).

55.    In addressing this same Ground 8, the Supreme Court of Virginia wrote, "'precedent is of long standing that a venireman will not be excluded from the jury if that person stands indifferent in the cause." (Resp. Exh. F at 13 (citing *Townsend v. Commonwealth*, 279 Va. 325, 331 (2005) (internal citations omitted)).   The court also opined that a person's "mere exposure to media coverage" does not trigger automatic disqualification or necessarily alter their ability to consider the evidence impartially.  (Resp. Exh. F at 13).

56.    Both the prosecutor and petitioner's counsel had an opportunity to question the juror about how she knew the prosecution's witness and whether

that knowledge would affect her ability to serve an impartial juror, and she answered that it would not. (Resp. Exh. G at 377-79). "A potential juror who has knowledge of the case, even if such person has formed an opinion about the case, is entitled to sit on the jury if that opinion can be set aside." *Teleguz v. Commonwealth*, 273 Va. 458, 477, 643 S.E.2d 708, 720 (2007). The question instead is simply whether a juror can render a verdict "solely on the evidence before it." *Cressell v. Commonwealth*, 32 Va. App. 744, 755, 531 S.E.2d 1 (2000). And the trial court was satisfied, after voir dire, that Juror Belcher could do so. The Supreme Court of Virginia also found that it was reasonable for petitioner's counsel to determine a motion seeking Juror Belcher's removal would have been unsuccessful given her responses to the attorneys' questions, and they were not deficient for failing to make such motion. (Resp. Exh. F at 14). Given Juror Belcher's answers, the determination by all counsel that she could remain impartial is supported by case law. This Court should defer to the ruling of the state court as it relates to petitioner's Ground 8, and this claim should be dismissed.

57. Finally, in his Ground 9, petitioner alleges that his counsel were ineffective for failing to voir dire Deputies Petrakos and Russell regarding the expertise they testified they had in determining the compliance of vehicles with the state's safety requirements and that the opinions the deputies ultimately testified to were "outside their area of expertise." (Pet. at 23-25, 27). Petitioner claims Deputy Petrakos was incorrect in his assessment that the brakes were improperly bled on his food truck. (Pet. at 27). He claims Deputy Petrakos was

incorrect regarding petitioner's food truck having one continuous brake system. *Id.* He claims Deputy Petrakos was incorrect in testifying that the food truck's brake lights were inoperable and that the rust indicated that they had been disconnected prior to the crash, rather than having come undone as result of the crash. (Pet. at 30). Petitioner claims Deputy Petrakos "lied" about the poor condition of the food truck's tires. (Pet. at 31). Petitioner claims Deputy Russell's explanation of the introduction and travel of air bubbles in brake lines was "illogical and false." (Pet. at 28).

58. The Supreme Court of Virginia considered this same testimony from Deputies Petrakos and Russell that petitioner claims was fabricated and determined that, despite petitioner raising all of these alleged fallacies, he "fails to identify any specific testimony that was objectionable or outside the scope of the deputies' expertise." (Resp. Exh. F at 14). And because petitioner failed to do so, he had failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different. *Id.*

59. If petitioner's attorneys determined that either deputy was testifying to knowledge outside their expertise, his attorneys could have objected to each piece of testimony they believed was outside the scope, regardless of prior vior dire. But neither deputy did so here.

60. Deputies Petrakos and Russell testified that as sheriffs with the Loudoun County Sheriff's Office, they served as motor carrier safety inspectors, which required them to inspect commercial vehicles. (Resp. Exh. G at 380-81,

445-46).  In order to become a motor carrier safety inspector, Deputies Petrakos and Russell took a three-week, two-part course through the Federal Motor Carrier Safety Administration, which covered both driver and vehicle qualifications.  (Resp. Exh. G at 381-82, 446).  All motor carrier safety inspectors must be recertified annually, which requires completion of a two-day class that provides the inspectors with information on updates and that each inspector has inspected a certain number of commercial and passenger-carrying vehicles.  (Resp. Exh. G at 382, 446-47).  To fulfill that duty, they had to inspect many vehicles and determine whether that vehicle's systems were in working order.  (Resp. Exh. G at 380-83, 444-47).  Attorney Pouilliard stated that he concluded that these witnesses' training and experience were sufficient to warrant their qualification.  (Resp. Exh. I at 4).  Petitioner's contention that his attorneys should have objected to the testimony they offered as outside of what he argues was their expertise ignores the actual scope of their qualification, the trial court's basis for finding them qualified, and his attorneys' reasons to conclude that they had no basis to object

61.    An attorney is not deemed ineffective for failing to make futile objections.  *Correll v. Commonwealth*, 232 Va. 454, 469-70, 352 S.E.2d 352, 361 (1987).  Therefore, petitioner has not met his burden to establish his counsel's performance was deficient.  And because petitioner's allegation would have required his attorneys to make a futile objection, there was no reasonable likelihood of a different outcome, evidencing prejudice.  Considering this analysis, this Court should defer to the ruling of the state court because it was

both a reasonable application of law and a reasonable determination of the facts in light of the evidence presented. Petitioner's Ground 9 should be dismissed.

## Conclusion

62. Pursuant to this Court's Order and Rule 5(c) of the Rules Governing Section 2254 Cases, the Director has requested that the state court forward to the Clerk of this Court the complete records, or certified copies thereof, for the judgment Whitaker challenges. (Copies of the correspondence requesting the records are attached as Respondent's Exhibit K.) The Director denies each and every allegation not expressly admitted herein.

63. Because the state court decision dismissing Dane's claims was not an unreasonable application of federal law and was not based on any unreasonable finding of fact, no federal evidentiary hearing is necessary, and this Court should dismiss Dane's petition and deny him a certificate of appealability.

Respectfully submitted,

Harold W. Clarke, Director of
the Virginia Department of Corrections

Respondent herein.

By _____/s/_____
Counsel

Sharon M. Carr
Assistant Attorney General
Counsel for the Respondent
Virginia State Bar No. 81832

Office of the Attorney General
900 East Main Street
Richmond, VA 23219
(804) 692-0170
(804) 371-0151 (fax)
scarr@oag.state.va.us
oagcriminallitigation@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2021, this Brief in Support of the Motion to Dismiss and Rule 5 Answer was electronically filed with the Clerk of Court using the CM/ECF system, and a copy, including the referenced exhibits, was delivered to the following non-filing user: Tony Dane, No. 1930791, Haynesville Correctional Center, 421 Barnfield Road, Haynesville, VA 22472, petitioner, *pro se.*

By: _____/s/_____
Sharon M. Carr
Assistant Attorney General
Counsel for the Respondent
Virginia State Bar No. 81832

Office of the Attorney General
900 East Main Street
Richmond, VA 23219
(804) 692-0170
(804) 371-0151 (fax)
scarr@oag.state.va.us
oagcriminallitigation@oag.state.va.us